# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| O.E.O., | ) | |
| | ) | No.  2:25-cv-02283-DWL-MTM |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | July 9, 2025 |
| Fred Figueroa, et al., | ) | 2:02 p.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |


BEFORE:  THE HONORABLE DOMINIC W. LANZA, JUDGE


<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>


<u>TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION HEARING
VIA ZOOM VIDEOCONFERENCE</u>

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1              **A P P E A R A N C E S**

2    (All parties appeared by Zoom videoconference)

3    For the Petitioner:

4        IMMIGRANT DEFENDERS LAW CENTER
         By:  **Carson Scott, Esq.**
5              **Alvaro M. Huerta, Esq.**
               **Alison Steffel, Esq.**
6        634 S. Spring St., 10th Floor
         Los Angeles, CA 90014
7
     For the Respondents:
8
         U.S. ATTORNEY'S OFFICE
9        By:  **Katherine R. Branch, Esq.**
         40 N. Central Ave., Suite 1800
10       Phoenix, AZ 85004

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2              (Proceedings commenced at 2:02 p.m.)

3          THE COURTROOM DEPUTY:  We're on the record in Civil

4   Case No. CV-25-2283, O.E.O. versus Fred Figueroa, et al., set

5   before the Court for a temporary restraining order and

6   preliminary injunction hearing.

7          Counsel, please announce your appearances, beginning

8   with petitioner.

9          MS. SCOTT:  Carson Scott for petitioner.  I'm also

10  joined by Alvaro Huerta and Alison Steffel.

11         MS. BRANCH:  Katherine Branch on behalf of respondent.

12         THE COURT:  All right.  Welcome to counsel.  This is

13  the time set for the hearing on the petitioner's motion for a

14  temporary restraining order and motion for a preliminary

15  injunction at Docket No. 2.  I've reviewed the motion as well

16  as the response and the reply.  Thanks to everyone for getting

17  it briefed so quickly.

18         So with that, I'll turn to Ms. Scott.

19         MS. SCOTT:  Good afternoon, Your Honor.  I'll start by

20  arguing first why the temporary restraining order should be

21  granted.

22         We're here today because petitioner is a 15-year-old

23  unaccompanied Afghan minor who's currently being unlawfully

24  detained at Eloy.  The deprivation of petitioner's liberty came

25  as a result of ICE and ORR's failure to follow their

1    obligations to the petitioner under the TVPRA and their own

2    internal policies and procedures.

3         Petitioner asks this Court to grant his TRO and order

4    the following relief:

5         Preliminarily enjoin respondents from applying the age

6    determinations made by ICE and ORR until both agencies have

7    made a determination in accordance with 8 USC 1232(b)(4) and

8    their respective internal policy guidelines; and to also order

9    that the petitioner shall remain in ORR custody, and his date

10   of birth should be considered to be October 24th, 2009, until

11   ICE and ORR complete age determinations that are compliant with

12   their legal obligations for purposes of his immigration

13   detention and immigration proceedings.

14        Your Honor can order this relief because petitioner

15   has more than satisfied the elements of the TRO.  I'll start

16   first with our likelihood of success on the merits of our

17   claims as to respondent ICE.

18        Your Honor, first I'd like to point you to ICE's

19   obligations under the ERO Juvenile Coordinator Handbook, which

20   states that -- excuse me -- the FOJC must document all

21   information relied upon to determine age, including information

22   referenced, data systems used, individuals or agencies

23   consulted, statements and conclusions, in accordance with local

24   procedures using Form I-213, record of inadmissible/deportable

25   alien, G-166C, memorandum of investigation or memorandum to

1   file.

2           The government on Monday, Your Honor, filed the I-213

3   in this case.  The last entries on his I-213 are from May 21st

4   and 22nd.  None of those explain the information evaluated by

5   the FOJC in determining O.E.O. is an adult.  In fact, they only

6   rely on statements from Ms. Gast, which petitioner has cast

7   doubt onto the reliability of those in Exhibit O, I believe

8   it's O, where the Afghan Affairs Unit actually did not state

9   that the identity documents were verified.  It actually came to

10  the opposite conclusion, that it was unclear whether or not

11  they were valid documents.

12          THE COURT:  Just so -- I know we've got a lot of stuff

13  flying in quickly due to the nature of the TRO.  You said that

14  on Monday of this week ICE issued the document setting forth

15  their age determination?

16          MS. SCOTT:  I'm saying that ICE didn't conduct an age

17  determination at all.  And the reason we know that is because

18  the government filed the I-213, and if you look at the I-213,

19  Your Honor --

20          THE COURT:  The reason I'm looking back and forth, I

21  have my computer up here, so when I'm looking away it's because

22  I'm looking at my computer screen.

23          MS. SCOTT:  Yes.  Look at the I-213.  The last two

24  entries, the first states -- it's from the 21st of May, and it

25  states that the Court -- from FFS Lucibel Gast:  The subject is

not a juvenile.  And there's no indication of what evidence it
considered in that determination.

The second entry is from May 22nd, which again gives
no indication of what evidence was considered to determine that
petitioner was an adult.

So from this evidence, ICE has failed to conduct any
age determination under its obligations at all, in which case
it proves that we're likely to succeed on our claims that ICE
has failed to follow its obligations under the TVPRA and the
ERO Juvenile Coordinator Handbook.

THE COURT:  How, if at all, would ICE's procedures
differ from ORR's procedures?

MS. SCOTT:  Well, Your Honor, if we're going to look
at ORR's procedures, those procedures were faulty under their
obligations as well.

THE COURT:  We'll get to that in a moment, but my
question is how, if at all, do the two sets of procedures
differ?

MS. SCOTT:  Your Honor, ICE has essentially the same
exact obligations as ORR to consider the totality of the
evidence and the totality of the circumstances in
petitioner's -- in considering petitioner's age.

So it would be under an obligation to consider all of
the declarations that O.E.O. has supplied to ICE, all of the
evidence of his minority in the form of his school records, the

statement from his doctor, as well as a national identity he

presented from his sister, which shows she was born on

March 18th, 2003, making it physically impossible for his

mother to have had petitioner on March 21st, 2003, just, what

is that, three days later.

The government also -- ICE would also need to properly

consider the school records. The ORR age determination memo

states that his school record is not authentic because it

doesn't have any verification from the Ministry of Education.

But, in fact, if you look at the school record itself, it does

include a stamp that has the emblem of the Ministry of

Education.

The other important thing to note, Your Honor, is

ORR's documenting obligation is to create an age determination

memo, whereas ICE, the only difference is that they need to

report it in the I-213, in a Form G-166C, a memorandum of

investigation, or a memorandum to file. And to date,

petitioner has received no evidence of any of those documents

to show that ICE properly considered the evidence before it.

THE COURT: All right. So your position is that ICE

did not incorporate by reference ORR's previous determination?

MS. SCOTT: Our position is we don't believe ICE

created -- made a determination at all. If it did incorporate

by reference ORR's determination, that determination should

still be found to be flawed because it didn't comply with the

1  TVPRA.

2          THE COURT:  All right.  Let me -- we'll get into some

3  of the merits of the age determination in a moment, but what

4  cases can you cite me where a judge has ordered someone

5  released from ICE custody pursuant to a TRO or a preliminary

6  injunction based on a determination that the age determination

7  was wrong?

8          MS. SCOTT:  Yes, Your Honor.  I actually think I have

9  three cases that I'd like to point you to that I think are most

10  analogous to petitioner's.  The first is N.B. -- give me one

11  second while I find my citations.

12          The first is *N.B. v. Barr*.  The Westlaw citation is

13  2019 WL 4849175.  This case is from the Southern District of

14  California, and it was decided on October 1st, 2019.

15          The other case that I think is analogous and issues

16  the same relief is *R.R. v. Orozco*.  The Westlaw citation is

17  2020 WL 3542333.  That's from the District of New Mexico.  That

18  was issued the 30th of June, 2020.

19          And lastly, from Your Honor's district, the District

20  of Arizona, *I.J. v. Keeton*.  This case is Case

21  No. CV-19-01904-SMB, and that was issued in 2019.

22          THE COURT:  Okay.

23          MS. SCOTT:  All three of these cases issued the same

24  relief that petitioner asks for here today.

25          THE COURT:  You know, and I submit one of the points

that the government makes in response is, listen, I know that

it's very complicated.  You've got a lot of different claims

against a lot of different defendants, but fundamentally, the

request to order the petitioner released from ICE custody is

the relief that you would get at the conclusion of a habeas

case; and it's a misuse of the TRO or PI vehicle to grant what

is effectively the merits relief you get at the end of the case

pursuant to a preliminary determination at the start of the

case.

MS. SCOTT:  Your Honor, we're simply requesting that

he be held in ORR custody pending the habeas.  Our ultimate

relief is that he be released to a sponsor.

THE COURT:  Well, I guess maybe it's a different way

of phrasing it, but you are fundamentally asking that he be

ordered released from the custody of the ICE official who is

currently holding detention over him.  You're saying, you know,

he's not fully going to leave the government's custody, but

he's going to end up going to a different agency and they're

going to hold him in a different way; but you want me to issue

an order compelling an ICE official, pursuant to effectively

habeas, to give up custody of him.

MS. SCOTT:  Yes, Your Honor.  We think that it's not

asking for the same relief because ultimately we do ask for his

release, and for now we're just asking that he still remain in

government custody but just a placement that's more appropriate

1   to the circumstances at hand.

2         THE COURT:  Okay.  Let me ask some questions about the

3   merits of the ORR age determination.

4         So first let me provide what I think is my reading of

5   the memo, and then I'll see if you agree or disagree, and then

6   I'm going to identify what I perceive to be your criticisms of

7   the memo.

8         So the May 21st memo, the way I interpreted it,

9   identified four reasons why ORR determined that your client was

10   an adult.  First, that his passport contained a 2003 birth

11   date, and although he claims it was a false document, it

12   appeared valid according to the Afghanistan Affairs Unit.

13         Second, same thing for the national identification

14   card.  It had a 2003 birth date, and although there was a claim

15   that it was a fraudulent document, it appeared valid according

16   to the AAU.

17         Third, his dental radiographs, which showed a

18   77.5 percent likelihood of adult status.

19         And, fourth, the fact that his Tazkira, which

20   purported to show a 2009 birth date, appeared to be digitally

21   manipulated and fraudulent.

22         So on the one hand, they gave those four reasons for

23   why he should be considered an adult; and then they identified

24   two pieces of potentially contrary evidence, medical records

25   and school records, and they gave various reasons for not

1   assigning weight to those records.

2          Do you agree that that's the basic parameters of the

3   order?  There's four reasons they gave for finding him an

4   adult, and they said that there were only two categories of

5   contrary evidence?

6          MS. SCOTT:  Yes, Your Honor.  That's my reading of the

7   memo.

8          THE COURT:  All right.  So one of -- I guess -- so one

9   of your arguments is that as for the passport and national

10  identification card, they overstated AAU's verification of

11  their authenticity.  And I guess my question to you is, I've

12  carefully looked at the email that AAU sent.  I think it's at

13  page 42 of Docket 23.  And although it acknowledges the

14  possibility that the documents aren't genuine, why wasn't it

15  still reasonable and at a minimum not arbitrary and capricious

16  for ORR to interpret that email as proof of validity?

17         I mean, it's hard in this world in any context to

18  prove that anything is genuine or not genuine with a hundred

19  percent certainty.  The memo says, you know, they sure seem

20  certain even though we can't be a hundred percent sure without

21  looking at the authentic documents.

22         But don't I need to reasonably defer to ORR's

23  interpretation of that document?

24         MS. SCOTT:  Your Honor, ORR is not just under an

25  obligation to consider all the evidence, but they need to

consider the totality of the circumstances.  And here, part of

the evidence is that O.E.O. has consistently explained his

reasoning for why he obtained documents that say his age is

over 18 so that he could actually leave Afghanistan.

Second, Ms. Fox, his counsel, informed ORR -- she

provided country conditions expert testimony saying that this

is common practice for minors feeling the Taliban out of

Afghanistan.  They have to find -- they have to obtain

documents that say they're an adult; otherwise, they're not

able to leave.

So this context of O.E.O. fleeing persecution from the

Taliban is important context that we believe ORR didn't

consider.

Further, O.E.O.'s consistent statements of his

minority were also afforded essentially no weight.  So he is

consistent, which it's shown in his I-213, it's shown in the

memo, and it's shown in his declaration.  He has consistently,

since his first apprehension in November, explained the

circumstances and stated that that is not his real

identification and that that -- that that was only used in

order for him to be able to flee Afghanistan.  So those are two

important considerations.

The other thing to note is that it's unsurprising that

these documents would appear to be real.  The other

circumstance that needs to be considered is that O.E.O.'s

1    family sold a building and spent a significant amount of money

2    to obtain these documents so that they would appear real and

3    allow O.E.O. to flee persecution, to flee death threats from

4    the Taliban.  So it's unsurprising that these documents appear

5    valid.

6         It's not a problem that ORR would consider that.  It's

7    a problem that ORR's not considering the overall context of

8    where O.E.O. is coming from and the circumstances of him having

9    to flee.

10         THE COURT:  All right.  Thank you.

11         Another question:  So another criticism you have is

12   that they discounted the school records on the ground that

13   they're not authenticated.  And I thought that you mentioned

14   earlier, in fact, they were authenticated.  I thought you read

15   your motion as faulting them for claiming they were

16   unauthenticated with the argument being that it's not really a

17   fair burden to require authentication, because that just means

18   going to the government that's controlled by the very people

19   that would persecute.

20         I understand the argument and I understand why as a

21   practical matter it's difficult to get authentication, but is

22   it -- isn't it still reasonable for an agency to assign more

23   weight to authenticated documents and decline to give as much

24   weight to unauthenticated documents?  I mean, these agencies

25   can't just uncritically accept everyone's claim.  They need to

1  carefully evaluate them.  In a million different contexts, we

2  rely on authenticated documents and we assign less weight to

3  things that we can't prove are real.

4          MS. SCOTT:  Yes, Your Honor.  Actually, reasoned

5  decision-making is essential for the agency, right?  This is

6  the crux of our arbitrary and capricious claim.

7          The problem with ORR's consideration is not that they

8  assigned more or less weight because of the authentication.

9  It's that they claimed there was no authentication when in fact

10  the image of the school records shows the emblem of the

11  Ministry of Education.

12          So the reasons they gave for assigning zero weight to

13  the school records are not a valid basis under which it can

14  discount the evidence.  And the case law says that where the

15  record evidence before the Court shows that there's a contrary

16  conclusion that should have -- that the agency should have come

17  across, this is template arbitrary and capricious behavior.

18          THE COURT:  All right.  Just a moment.

19          I'm looking at your motion for TRO on pages 11 and 12.

20  And it seemed to me the only argument you made there was that

21  it was unfair to require authentication.  Did you argue in your

22  TRO motion that in fact the document was authenticated?  I

23  might have just -- you know, again, a lot of paperwork came in

24  quickly so maybe I overlooked it, but I don't recall seeing

25  that specific argument in your motion.

1          MS. SCOTT:  I believe it is, Your Honor.  Let me find

2    it.  And if not, it's at minimum in the habeas petition.

3          And, Your Honor, I'm not finding it, but let me find

4    it in the complaint for you.  It may have gotten cut trying to

5    reach the page limit.  Apologies.

6          We do say:  They purportedly lacked attestation from

7    the Ministry of Education, Your Honor.

8          On the habeas and complaint, Your Honor, paragraph 31:

9    O.E.O.'s school records state that O.E.O. started attending

10   school in 2017.  Second sentence:  The school record provided

11   to FFS Gast includes the stamp of the Afghan Ministry of

12   Education.

13         And you can compare -- I believe it's Exhibit D that

14   has the record with the stamp at the bottom left corner.

15         THE COURT:  Okay.  All right.

16         Another point I wanted to raise, it seemed to me that

17   one of the significant points raised in the ORR memo was that

18   the Tazkira that your client submitted was digitally

19   manipulated and fraudulent.  And maybe I again overlooked it,

20   but I didn't -- I don't recall seeing a specific response to

21   that point in your TRO motion.

22         MS. SCOTT:  Your Honor, I'm not finding it right now,

23   but I will continue to look.

24         I do want to, however, call into question how much we

25   can rely on ORR's statements given their misrepresentation of

what the Afghan Affairs Unit stated in their initial email as

to the national ID and the passport.

So there, in that email, we get the benefit of the

full analysis of the Afghan Affairs Unit where they clearly say

that it's difficult to come up with a conclusion based just on

photos.

The second email, we're unsure what the full

determination of the Afghan Affairs Unit is, and we can't rely

on ORR's explanation for discounting the Tazkira when we don't

have the full -- the full opinion of the Afghan Affairs Unit

and they've previously misrepresented what the Afghan Affairs

Unit determined as to the other national identities.

THE COURT:  Well, let's just assume for a moment that

there is a sufficient foundation in the record, or at least it

wasn't arbitrary and capricious for ORR to accept that the

Tazkira was digitally manipulated and fraudulent.  Isn't that a

pretty big deal in the overall totality of the circumstances?

Again, in all sorts of contexts, when a fact-finder

has determined that a litigant or a claimant has been

intentionally deceptive on some point, that opens the doors for

that fact-finder to resolve the totality of circumstances

against the claimant, even if there are some other pieces of

evidence in the record that might in isolation support the

claimant.

It seems to me that that -- you know, when I looked at

1  it, that was a pretty big deal, that portion of the ORR memo,

2  and I didn't see a very developed response to it.

3       MS. SCOTT:  Your Honor, petitioner has not once been

4  found to be not credible.  He has been consistent since his

5  arrival at our port of entry in stating that his date of birth

6  is October 24th, 2009.  And there's mountains of evidence in

7  the record corroborating that statement.

8       So again, I understand Your Honor's point, but ORR is

9  not providing actual Tazkira, actual passport, actual national

10  ID.  They're just sending over photographs of this evidence,

11  and it's difficult for the Afghan Affairs Unit to determine

12  whether or not they're authentic.

13       And, you know, I will note the Tazkira as well has --

14  it's a photo identification of O.E.O. when he was a minor, and

15  it's unclear -- it's unclear to me from the decision which part

16  of the -- of the Tazkira they're calling into question.  I know

17  that they say the date of birth, but I believe his date of

18  birth is on here twice, if I'm not mistaken.

19       THE COURT:  All right.  Separate from the age

20  determination, a different question:  I read -- I read your

21  motion papers as asserting, separate from the harm of being

22  improperly housed in an adult facility when your client is in

23  fact a child and is entitled to be, for a variety of reasons,

24  in a less restrictive environment, a different harm was that

25  the age restriction is meaning that he's being placed in

1    expedited removal proceedings without the ability to pursue

2    asylum.

3           However, I read -- and we'll get the government to

4    respond to this point as well in a little bit, but I read the

5    government -- I interpreted the government's response brief as

6    saying, in fact, your client is being allowed to pursue asylum,

7    and he will not be removed until the asylum proceedings have

8    been revolved.  And so I wanted to get your take on that.

9           MS. SCOTT:  Sure, Your Honor.  And just to clarify,

10   apologies.  There's not two date of births on the Tazkira.

11          As to their claim that there's no harm because he's

12   allowing his asylum then to move forward, I want to clarify the

13   difference between Section 240 proceedings and expedited

14   removal proceedings.

15          So petitioner was given an initial credible fear

16   interview.  That interview has yet to be completed.  Once he

17   completes that interview, the asylum officer will determine

18   whether or not he has a credible fear of returning to his home

19   country; and if he gets a positive determination on that, he

20   will then be put into expedited removal -- or, I'm sorry,

21   Section 240 proceedings.

22          At the moment, and if he were to receive a negative

23   credible fear determination, petitioner only has one IJ review

24   of that determination; and after that, if the IJ declines

25   again, he'll be removed from this country.

1          And I just want to point the Court to an important

2   distinction.  So the government, in their argument, quotes *Nken*

3   to say that petitioner can't show irreparable harm because,

4   quote from *Nken*:  The burden of removal alone cannot constitute

5   the requisite irreparable injury.

6          But if you keep reading that holding from SCOTUS,

7   SCOTUS says:  Aliens who are removed may continue to pursue

8   their petitions for review, and those who prevail may be

9   afforded effective relief by facilitation of their return along

10  with restoration of their immigration status they had upon

11  removal.

12         That is not the case in expedited removal.  In fact,

13  Section 1252(a)(2)(A) explicitly prohibits judicial review of

14  removal orders except for the habeas context.  So in other

15  words, Your Honor, the proceedings currently before this Court

16  are the only mechanism that petitioner has to challenge his

17  detention, and absent this review, he will not have an

18  opportunity to continue with his claim under the TVPRA, which

19  he's lawfully entitled to pursue his asylum claim before USCIS,

20  not before the immigration judge.

21         And, in fact, this is why the immigration judge, on

22  April 15th, terminated petitioner's proceedings.  She

23  presumably agreed that he was a minor and that USCIS lawfully

24  had jurisdiction over his asylum claim.  He should be allowed

25  to remain in the United States, out of the custody of the

1  government, to pursue his asylum claim before the asylum office

2  with the protections of the TVPRA.

3          THE COURT:  All right.  Thank you.

4          Ms. Branch?

5          MS. BRANCH:  Thank you, Your Honor.

6          The issue in this case is whether or not the agency

7  has followed their policies and procedures when they made their

8  age determination.  And in this case, there's ample evidence in

9  both the age determination memorandum and then subsequently in

10 the age redetermination memorandum by ORR that they considered

11 the totality of the evidence that had been presented by

12 petitioner to determine that he was in fact an adult.

13         I want to make a couple of points in response to some

14 of the evidentiary issues that were raised.  The first is the

15 issue of whether or not the education records are verified by

16 the Afghan Ministry of Education.

17         I would first posit that -- so the stamp that appears

18 on the translated page of Exhibit D, the spiel that has the

19 book and some other icons in it, is not reflective of the

20 Ministry of Education stamp.  It appears to be the translator's

21 stamp of authentication, because the same stamp appears on the

22 English version of Exhibit E, which is the medical record,

23 quote/unquote, provided by the doctor.

24         So those stamps don't appear to be authentication

25 stamps by any government agency.  They appear to be the stamps

1   of the translators' sort of attestation that they had

2   adequately translated the documents that were otherwise written

3   in a foreign language.

4        Further, even if they were, the documents were

5   submitted to the Afghan -- the AAU, the Afghan Affairs Unit,

6   who indicated that they could not be authenticated because they

7   did not bear any indicia of authentication.  And so rather than

8   comparing the image on the internet to what the Afghan Ministry

9   of Education's spiel looks like, I think the Court and ORR

10  fairly defer to the AAU to determine that those had not been

11  authenticated.

12       With respect to the issue of whether or not the

13  passport and the national identification card, which petitioner

14  admits were validly obtained -- or are valid documents that

15  were fraudulently obtained, there is an email that appears at

16  Exhibit O, wherein someone at the Document Verification Center

17  inbox says that it would be better if we could see the

18  documents in person.

19       There is subsequently an email at Exhibit Q dated

20  April 21st that indicates that the AAU has again determined

21  that the passport and national identity card are valid

22  documents.

23       Because of the time that the government had to respond

24  to this, I was unable to determine whether the documents had

25  been sent in the meantime or not.  But I think it's a fair

1    assessment, or at least not unreasonable, for ORR to rely on

2    the fact that the AAU has at least at two junctures reviewed

3    these documents and determined them to be valid documents.

4           So ORR made a determination looking at the totality of

5    the evidence, which is the standard provided in the ORR guide,

6    not the totality of the circumstances.  Because Your Honor

7    points out there are lots of people who claim that there are

8    many reasons or circumstances beyond their control that would

9    require them to flee their country, but ORR considers the

10   totality of the evidence; and in this case they have done that.

11          ICE follows basically the same ORR guide.  They look

12   at the same information.  They reviewed the, I guess, demand

13   letter that plaintiff's counsel sent to the field office

14   director in early June asking that ICE redetermine his age, and

15   they again determined that the petitioner is an adult.

16          That apparently has not been updated in the I-213.  I

17   don't know that that's required to be updated in the I-213.

18   That's something that I would need to look further into.  But

19   there is certainly an email to petitioner's counsel that they

20   have attested to in their declaration saying that they sent

21   this information, that ICE had originally potentially agreed

22   that he was a minor, ultimately reconsidered its position, and

23   confirmed that he was an adult and that he would not be

24   referred back to ORR.

25          THE COURT:  On that question, what do I -- what do I

1   do with the fact that the law seems to contemplate that each

2   agency will make its own determination, even though they

3   consider the same factors, and although ORR has a nice memo

4   laying out its analysis and its consideration of the various

5   pieces of evidence, ICE initially says, we're not even going to

6   do this determination, and then they ultimately provide a

7   one-sentencer with no reasoned analysis, just a conclusion, and

8   no identification of the evidence that they considered?

9       MS. BRANCH:  Well, I'm -- if the emails between

10  petitioner's counsel and ICE have been filed, I have not seen

11  them.  And so I'm relying on what petitioner's counsel

12  represents in her declaration filed at Exhibit 11 about what

13  ICE purportedly said to her.

14      I think that if that's the case, the Court can order

15  ICE to prepare a memo, but I don't think that the Court can

16  order ICE to determine that ORR's assessment and ICE's

17  assessment is incorrect and release the petitioner back to the

18  custody of ORR.

19      THE COURT:  Wasn't ICE required to perform its own

20  analysis and document its conclusions?

21      MS. BRANCH:  Your Honor, to be frank with you, they

22  are required to perform their own analysis.  The information,

23  according to the exhibits that were filed, the demand letter

24  that was sent to ICE in early June by petitioner's counsel

25  includes a number of exhibits, including the application

1  letter, the identification card, and the declarations of many

2  of petitioner's family members.

3          It does not appear to attach the passport and the

4  national identification card or the Tazkira that had previously

5  been provided to ORR, but I know that ICE does have those in

6  their custody because they were included with the I-213 and the

7  documents that I was provided by ICE.

8          And so at this point we don't know necessarily what

9  ICE looked at when it made the conclusion that petitioner was

10 an adult, but they've certainly been provided all of the

11 evidence, and there's no reason to suspect that they did not

12 review the evidence when they received petitioner's counsel's

13 demand that they redetermine his age and ultimately determined

14 that he was an adult.

15         With respect to what they have to do to document that

16 decision, I have not had an opportunity to look at the SJO

17 handbook to determine what that requires them to do.  It says

18 that the SJO documents all information relied upon to determine

19 age:  The information referenced, data systems used,

20 individuals or agencies consulted, statements and conclusions,

21 in accordance with the local procedure using Form I-213,

22 Form G-166C, or a memorandum to asylee.

23         Candidly, I -- given the quick turnaround on this, I

24 have not been able to speak with the FJOC [sic] to determine

25 what documents exist in the file documenting ICE's

1    determination.  It looks like the last update on the I-213 is

2    in May, which precedes the time that petitioner's counsel made

3    the demand that ICE redetermine petitioner's age.  So it's

4    possible they just have not updated the I-213, but that's

5    certainly something that they could do.

6         THE COURT:  How is it -- how can I find that they were

7    not arbitrary -- ICE, separate from ORR, was not arbitrary and

8    capricious in its determination when I don't even know what its

9    determination was?  All I have is a sentence announcing its

10   conclusion.

11        MS. BRANCH:  Well, I think even if the Court

12   determines that it was arbitrary and capricious, the relief is

13   to have them make that determination again, not to release the

14   petitioner to ORR and, as sought in both the petition and in

15   the temporary restraining order, directing ORR then to release

16   the petitioner to a family sponsor in the Bay Area.

17        THE COURT:  I'm just struggling with that, with -- you

18   know, this -- it's a hard case from my perspective because it

19   seems wrong to just ignore ORR's analysis because it preceded

20   ICE's, and it seems logical to me that it informed ICE's

21   analysis in some way; but it also seems wrong to me that ICE

22   could never find that someone is in fact an adult, and the

23   relief would just be the courts keep telling them to try to do

24   it again, and the person just sits in adult custody the whole

25   time.  That can't be right.

MS. BRANCH:  I don't think that is right, Your Honor.
I don't think that there's anything that would prevent ICE from
making an independent determination disagreeing with ORR and
finding that the individual in their custody is in fact a
minor.

But at this point, we don't know what it is that
ICE -- you know, we don't know decisively what it is that ICE
reviewed when it determined that petitioner was an adult, but
it has certainly made a finding that he is an adult.

THE COURT:  Okay.

All right.  I want to -- I want you to address the --
one of the questions I had earlier:  What do I do with the ORR
determination that the Tazkira is fraudulent and digitally
manipulated?  I know your friend on the other side had said
that I shouldn't heed that because AAU didn't provide an
explanation for that and they've been shown to have not really
properly analyzed other issues.

MS. BRANCH:  Well, I'm not really sure that AAU has
been shown to have not properly analyzed other issues.  Their
analysis of the passport and the national identity card is that
they were valid documents, and according to the declarations
submitted by plaintiff's family members, they apparently are
valid documents that were just obtained through potentially
bribery of a government official to fudge the dates on them.
And so I don't know that AAU has been determined to be less

1    than credible or uncredible on these issues.

2         I think that, you know, the -- I don't know that the

3    original of the Tazkira has been provided.  I -- my

4    understanding is that it was either scanned or a cell phone

5    photo of it was taken and provided to someone at Crittenton

6    Shelter when petitioner was there while his age was being

7    determined.

8         So I think that in light of the fact that there are

9    two pieces of evidence that appear to be authentic and verified

10   and issued by the Afghan government, AAU's assessment of the

11   third piece of evidence provided by petitioner's mother, I'm

12   not sure how or in what format was determined to be altered in

13   some way, I don't think that those two things are inconsistent

14   with each other.

15        THE COURT:  Okay.  Different criticisms of ORR's

16   determination that petitioner has, one of them is that -- has

17   to do -- I know we talked a moment ago about the medical --

18   excuse me, about the school records, but separately, there are

19   the medical records from the doctor.

20        And I got to say, on that one, it seemed to me that

21   they discounted it because it was written on a prescription

22   pad, but it was still signed by the doctor.  I mean, what else

23   do you need to do to show that it was from the doctor?

24        MS. BRANCH:  I mean, I think that is one piece of

25   evidence, but you also have documents that are issued by the

1  government of your country indicating that you are an adult.

2  You have a potentially altered Tazkira.

3       And so considering the totality of the evidence that

4  has been presented, a letter submitted by a doctor on the other

5  side of the world who we have no ability to question, no

6  ability to determine if that person is actually the person who

7  wrote this, is actually the person who provided these medical

8  services, it's one piece of evidence and it's considered, but

9  it's not the determinative piece of evidence.

10       THE COURT:  All right.  Another criticism that has

11  been raised is that, listen, the ORR memo doesn't even

12  acknowledge several additional pieces of evidence we submitted,

13  including the declarations from a bunch of family members and

14  the petitioner's sister's identification card, which has a

15  birth date that would support his.

16       So how can this memo not be arbitrary and capricious

17  when the decision-maker didn't even seem to be aware of some of

18  the potentially key evidence?

19       MS. BRANCH:  I think it's unfair to say that the

20  decision-maker was unaware of the key pieces of evidence.  I

21  think that, you know, could the memorandum have specifically

22  addressed every piece of evidence that was reviewed?  Yes.  Was

23  it required to?  No.

24       But the first age determination memo or -- yes, the

25  first age determination memo is dated May 1st.  The

1  declarations and the other evidence submitted by the family

2  members bears a date of May 7th.  The age redetermination memo,

3  which references the fact that additional documents including

4  the school records and the medical records have been received

5  by the mother, is dated May 21st.

6         And so I think it's a fair assumption to make that all

7  of the evidence was evaluated, that all of it was reviewed by

8  ORR in making its decision.  It could have been documented

9  better; I don't disagree with that.

10        But I think at this juncture, on a preliminary

11 injunction, I don't think that petitioner has satisfied the

12 likelihood of success on the merits just because there are a

13 few evidentiary issues that could certainly be wrinkled out

14 when the government has an opportunity to respond to the

15 petition writ large.

16        THE COURT:  Okay.  Another point I addressed earlier

17 has to do with, separate from the question of where

18 petitioner's being detained, the question of how his age

19 determination is affecting his ability to pursue an asylum

20 claim.  So if you could just be heard on that.

21        MS. BRANCH:  Sure.  So minors are not subject to

22 expedited removal proceedings, so when he was initially

23 classified as a minor because there were discrepancies

24 regarding his age, he was issued a notice to appear.  That puts

25 him into 240 proceedings before an immigration judge.

1          Once it was determined that petitioner is in fact not

2     a minor but an adult, he was not entitled to be placed into 240

3     proceedings.  He was subject to expedited removal under 235.

4     The 240 proceedings were canceled.  He was issued an expedited

5     removal order.

6          He will get a credible fear hearing before an asylum

7     prescreening officer.  If the asylum prescreening officer

8     determines that he has a credible fear, then he will be placed

9     into 240 proceedings again.  If the fear determination is

10    negative, petitioner has the opportunity to have an immigration

11    judge review that.

12         If the immigration judge finds that his credible fear

13    determination -- the negative credible fear determination

14    stands, then he is subject to expedited removal.  If the

15    immigration judge determines that he does have a credible fear,

16    then he again goes into 240 proceedings.

17         THE COURT:  Okay.

18         MS. BRANCH:  And then just -- the Court had asked

19    petitioner's counsel about cases that had basically made the

20    finding that they're asking the Court to make in this case, and

21    petitioner's counsel cited three cases.  I think that those

22    cases are distinguishable for a number of reasons.

23         In the N.B. case, the petitioner had a birth

24    certificate indicating that he was a minor.  He had used a date

25    of birth -- he had given government authorities in Central

1   America an older date of birth as he was encountered making his

2   way north, but he had government documents indicating that he

3   was a minor, and he maintained once he arrived at the border

4   that he was a minor.

5           In that case, the government -- the Court found that

6   basically the government was relying solely on the dental

7   x-rays, which I think is distinguishable in this case, because

8   in this case petitioner obviously has government documents

9   indicating that he is an adult.  And the dental x-rays are just

10  a piece of evidence that the government obtained after, you

11  know, petitioner continued to claim that he was a minor.

12          Largely, the same factual pattern in R.R.  The

13  petitioner had a birth certificate and tax records from his

14  country of origin indicating that he was an adult.  And the

15  government -- the Court found that the government used the

16  dental x-ray as the definitive piece of evidence to determine

17  that he was a minor.

18          And then in the I.J. case, in that case the fact

19  really is that ICE had been informed that there were a number

20  of Bangladeshi detainees in the district who were using

21  fraudulent documents to claim to be minors, and so the

22  government discounted the documents entirely and performed a

23  dental x-ray.

24          And so I think that those cases are distinguishable

25  because in this case we have documents -- legitimate documents

1  from the government indicating that the petitioner is an adult

2  and that the document indicating that he is a minor has been

3  altered and that the other documents -- the medical record and

4  school record can't be authenticated, and so I think that those

5  cases are distinguishable.

6      THE COURT:  Okay.  I think one of the broader points I

7  had in bringing up the question of whether courts had granted

8  this relief is, you know, it's very tricky from my perspective

9  trying to work through, even assuming petitioner could show

10  that the age determination was invalid, whether it would be

11  permissible at this early stage of the case to grant what is

12  effectively the merits relief he wants at the end of the case,

13  which is a release from custody.

14      And I know you made that point in your response, but I

15  guess the counterargument would be, notwithstanding that, it

16  sure seems like at least a couple courts have done that.

17      MS. BRANCH:  Yes, they have.  And there are other

18  courts, including a court in the Northern District Texas, that

19  have not done it.  So it goes both ways.

20      THE COURT:  Okay.

21      All right.  Anything else?

22      MS. BRANCH:  No, Your Honor.

23      THE COURT:  All right.  Ms. Scott?

24      MS. SCOTT:  Your Honor, a couple responses to opposing

25  counsel.

1          First and foremost, the stamp on the educational -- on

2   the school record, opposing counsel is correct that the stamp

3   on the translation is from the translation office, but on

4   page 9, that is a distinct stamp that is not present on the

5   medical record.

6          THE COURT:  Can you point to me the specific page

7   number in the record, the docket number and page number this is

8   at?

9          MS. SCOTT:  I'm sorry, Your Honor.  My exhibit list

10  isn't Bates stamped.  I'll give that to you in one second.

11  It's under Exhibit D.

12         THE COURT:  Okay.

13         MS. SCOTT:  Docket 10, Exhibit D.  It should be in the

14  early stages.  Our stamping is 9.

15         THE COURT:  Okay.

16         MS. SCOTT:  I can show it here.  This is the

17  untranslated version.  This is the stamp that we're referring

18  to.

19         THE COURT:  Okay.

20         MS. SCOTT:  And when you look at the emblem at the

21  very center of this stamp and compare that to the stamp from

22  the Ministry of Education, the image is the same.  And the text

23  on the outer part of the stamp is also the same as that found

24  on the Ministry of Education.

25          So this is not the translation stamp.  The translation

stamp has different imagery, which I'll hold here. It's a
computer, some sort of square, and a book. We're not talking
about the stamp from the translation service. We're
specifically referring to a stamp that has the same
characteristics -- that incorporates the characteristics of the
emblem of the Ministry of Education.

Second, the government can't have it both ways.
Government counsel claims government officially issued
documents but fraudulent documents. The logical conclusion
here is O.E.O. and his family did what they needed to do to
obtain documents that would allow him to escape persecution.

So it's not whether they're valid or whether they're
not valid. It's, again, the context of the situation.
Petitioner needed to flee. The only ability for him to flee
would be to have identity documents that presented him as an
adult.

And this is exactly what, as counsel just said, N.B.
did. N.B., up until his presentation at the port of entry,
traveled under a date of birth that presented him as an adult
so that he could properly flee to the United States and seek
asylum.

Third, the government says that ORR is not obligated
to consider the circumstances. Not so. The ORR policy
guidance explicitly states, and I'll quote: Procedures for
determining the age of an individual must take into account the

1  totality of the circumstances and evidence, including the

2  nonexclusive use of radiographs.

3      Respondent can't escape the fact that they are under

4  an obligation to also consider the circumstances.  And quite

5  frankly, this proves our *Accardi* claim, right?  The government

6  is under -- agencies are under an obligation to abide by their

7  internal policies and procedures.  Here they were required to

8  consider the totality of the circumstances.  That means that

9  they needed to consider the context in which petitioner fled to

10  the United States.

11      And the fact that as -- you know, as presented to ORR

12  in its determination, obtaining documents that state that the

13  petitioner is -- has reached the age of majority is common

14  practice for Afghan minors fleeing the country.

15      My other point, Your Honor, is that the sister's ID

16  was presented to ORR actually on the date of April 15th, and

17  all those declarations were also presented to ORR starting

18  May 8th.

19      So these were -- this was evidence that the agency had

20  in its possession, and for some inexplicable reason makes

21  absolutely no mention of it in its memo.  And some passing

22  reference that one can read into being considered an agent of

23  the declaration is simply not enough.  We need reasoned

24  decision-making.  Agencies are required to provide reasoned

25  decision-making, and without explicit statements acknowledging

1   that they considered that evidence, we can't here read into a

2   statement that doesn't explicitly describe that evidence.

3         Furthermore, ORR's memo lists out the evidence that it

4   did consider.  If it did consider that evidence, one would

5   think they would have listed it in the numbered list along with

6   all the other evidence they did consider.

7         As to the three cases that I cited for being most

8   analogous, I want to just highlight what all three of those

9   cases and petitioner's case have in common.  All three of those

10  cases used false documents to travel to the United States so

11  that the petitioner could arrive at the United States and

12  present their asylum claim.

13        In all three of those, the judge did not discount that

14  against the petitioner because, again, the agency needs to

15  consider the totality of the circumstances, that these were

16  minors needing to flee their country through whatever means

17  that they could.

18        They also have a number of documents that do

19  corroborate the minor's minority.  They also all use dental or

20  medical exams, but notably, all the dental and medical exams in

21  those three cases had percentages much higher of probability

22  that their petitioners had reached the age of majority, ranging

23  within 80 and 90 percent.

24        Here, petitioner barely hits the 77 percent threshold.

25  And in fact, the age span that the dental exam includes is --

1    the low range is 16.  ORR has determined that they're going to

2    assign the 22, which is the top range, to petitioner, but why

3    not assign the bottom range?

4         Petitioner currently is 15.  His birthday is just

5    months away.  I believe October is three months away, so it's

6    not unreasonable to conclude that, yes, petitioner is almost 16

7    years old, but why O.E.O. would need to rely on the top range

8    of that dental exam is also argument that it's arbitrary and

9    capricious compared to all the other evidence corroborating his

10   minority.

11        And also, the dental exam doesn't cite to any studies

12   that take into account petitioner's genetic and ethnic

13   background.  So petitioner is an Afghan minor, and the evidence

14   cited to is for people of very distinct genetic backgrounds,

15   such as Japanese youth and I believe Black youth.

16        And the other -- the other point, Your Honor, is that

17   the request we're -- the relief that we're requesting has been

18   granted in those other analogous cases, and it's just temporary

19   relief while we're waiting for the merits of the habeas

20   petition and the merits on the -- and the complaint merits.

21        The deprivation here, the severity of the deprivation

22   here, is too serious to not take petitioner out of adult

23   custody and place him in a placement that's more suitable.

24   Other courts have provided the same relief here, and ICE should

25   not -- should be required to explain its age determination so

1   that the Court can consider whether it was arbitrary and

2   capricious or not.

3           And petitioner should be transferred to ORR custody in

4   the meantime to prevent further irreparable harm.

5           THE COURT:  All right.  Thank you.

6           Here's what I'm going to do.  I am going to -- I want

7   you to stay on the line.  I need to write down some notes and

8   do a little more thinking, and then I'll come back and deliver

9   my ruling orally in a little bit.  So -- hopefully in a few

10  minutes, so please just bear with me.

11          MS. SCOTT:  Thank you, Your Honor.

12          (Recess taken, 3:00 p.m. to 3:08 p.m.)

13          THE COURT:  All right.  Is everyone back on the

14  screen?

15          MS. SCOTT:  Yes, Your Honor.

16          MS. BRANCH:  Yes.

17          THE COURT:  All right.  Thank you.

18          All right.  I've given -- I've now had a chance to

19  think more about this and write up some notes and consider it.

20  And I will just start right with the conclusion, and then I

21  will give my explanation on how I got there.

22          The motion before me is the petitioner's request for a

23  temporary restraining order and a preliminary injunction.

24  Although I find it presents a close call, I'm going to deny the

25  motion.

1          So the analysis, of course, begins with a

2 consideration of the likelihood of success on the merits.  And

3 I -- even though petitioner's arguments are not in any way

4 frivolous here, and they've given me some pause in thinking

5 about them, there are two different reasons why I'm -- I don't

6 think there's -- the petitioner has shown a likelihood of

7 success on the merits.

8          The first -- and I guess I won't dwell on it for too

9 long.  Even before we get into the substance of the age

10 determinations, I have significant concerns about whether I

11 could grant the relief that is being requested here.  So again,

12 one of the specific items of relief being sought in the TRO is

13 an order compelling, quote, O.E.O.'s transfer to ORR custody

14 within the next 72 hours.  And that's paragraph 4 in the

15 proposed order.

16          My concern with that request is that it is

17 fundamentally a request for habeas relief directed toward the

18 ICE defendants who are currently responsible for detaining

19 petitioner in immigration custody, and it's just not clear to

20 me that I have authority to grant that relief at this stage of

21 the case.

22          The first reason for my concern on that is that,

23 functionally, this request looks an awful lot like a request

24 for bail during the pendency of a habeas corpus proceeding.

25 And the problem with that is that *In Re: Roe*, 257 F.3d 1077,

1  the Ninth Circuit there not only reversed the Ninth Circuit's

2  decision -- excuse me, the district court's decision to grant

3  bail in a 2254 proceeding, but it also raised questions on

4  whether a district court ever has the authority to grant bail

5  pending a decision in a 2254.

6       And then they stated that even if that authority might

7  theoretically exist, it's an extraordinarily high standard that

8  would require an extraordinary case.

9       And so I take that into consideration when deciding

10  whether I can grant the type of relief that is being requested

11  here, which again, fundamentally is a release from ICE custody.

12  I know that he would then go in -- petitioner would go into a

13  different agency's custody, but the relief is still

14  habeas-style release from custody.

15       A related but distinct second concern I have is that,

16  as the government notes in its response, the request here is

17  functionally like a request for the ultimate relief that the

18  petitioner hopes to get at the end of the case pursuant to a

19  TRO or a PI, and I'm just not convinced I can grant that

20  relief, based on the cases cited in the government's response.

21       Now, I acknowledge we've had a fair amount of

22  discussion about this today.  Some district courts have granted

23  this type of relief despite those concerns.  I don't think at

24  this stage of the case I need to definitively decide the

25  answers other than to denote that for the two reasons I just

1  identified, I do have significant concerns about my legal

2  authority to do so; and the existence of those types of

3  concerns go to whether there's a substantial likelihood of

4  success on the merits or serious questions going to the merits.

5  Again, I know that these issues are very complicated.

6  It raises questions at the complicated intersection of habeas

7  law and agency law and the APA.  I also recognize that

8  petitioner, unlike the petitioner in *Imon v. Keeton*, my old

9  case from 2020, isn't relying solely on habeas but is also

10  bringing APA-style claims against the ORR.

11  However, the irreparable harm here is the harm the

12  petitioner is experiencing from his placement in adult custody

13  in the ICE facility.  That's really the heart of the request

14  here, and so I think that that fundamentally sounds in habeas.

15  All right.  So that's one of my grounds.  The other

16  one has to do, separate from whether I can even grant this

17  relief, getting into the merits of the age determination.  I

18  want to start with ORR, because that's the one that has

19  received the bulk of the attention in the briefs.  I'll then

20  speak in a moment about ICE's separate determination.

21  All right.  So the ORR determination is set forth in

22  the May 21st, 2025, memo, the memo of age redetermination.  And

23  one of the really critical things here is identifying the

24  standard of review that I apply when I look at that.

25  I think it's important to note that this is not some

1    sort of de novo appeal where a petitioner gets to relitigate

2    the merits of the age determination in front of me and I make

3    my own independent decision.  Instead, the ORR's decision can

4    only be overturned if it was arbitrary and capricious.  And

5    although that isn't a rubber stamp, there still needs to be

6    reasoned analysis.  It's a deferential standard of review, and

7    that deference is in large part what is driving my

8    determination why the first *Winter* factor doesn't favor the

9    petitioner.

10            So again, as I spoke with Ms. Scott when we were --

11   during the initial part of the argument, ORR identified four

12   pieces of evidence supporting its determination that petitioner

13   is an adult:  the passport, the identification card, the dental

14   radiographs, and the fact that the Tazkira was digitally

15   manipulated.  And then it also disregarded two other categories

16   of evidence, the medical records and the school records, based

17   on the lack of appropriate authentication.

18            It's significant to me that at the conclusion of the

19   memo, ORR specifically and expressly verified that it had

20   considered the totality of the evidence in reaching its age

21   determination.

22            So during this proceeding, petitioner has raised a

23   number of criticisms of ORR's approach.  I think that it's fair

24   to group those into the following six categories:

25            First, ORR just ignored two important categories of

evidence, the statements from petitioner's family members and petitioner's sister's identification card.

Second, the claim about the lack of authentication of school records both ignores the fact that the records have a stamp on them and ignores the fact that seeking verification would expose petitioner to retaliation.

Third, as for the medical records, petitioner improperly -- excuse me, the ORR focused too much on the fact that it was written on a prescription pad when it ignored the fact that it was still signed by the doctor.

Fourth, ORR overstated the evidence regarding AAU's assessment of the validity of the passport and identification card and ignored the fact that AAU acknowledged that they might not be valid and would need to see the originals.

Fifth, ORR ignored various problems with the dental radiographs, including the points that were raised by Ms. Scott today about he comes from a distinct ethnic group, and it just gives an age range.

And finally, given all the aforementioned shortcomings, ORR effectively relied solely on the radiograph, which violates internal policies.

When I evaluate those, I will state that right off the bat I am not persuaded that four of the six of them show arbitrary and capricious behavior.

First, as for the school records, although I

1 understand the point that there can be all sorts of

2 consequences that would flow --

3             Excuse me for just a moment.

4             (Brief pause in proceedings.)

5             THE COURT:  I apologize for that.

6             So first, as for the authentication of the school

7 records, although I recognize that there can be all sorts of

8 consequences that could flow from seeking the type of

9 additional verification that ORR thought should have been

10 provided, for the reasons that I stated earlier in my comments

11 to Ms. Scott, I still don't think it's arbitrary and capricious

12 for an agency to place more weight on authenticated records and

13 not place as much weight on unauthenticated records.

14             These agencies cannot uncritically accept claims of

15 minority status.  They need to verify it, and they need to use

16 the traditional tools to do so.  And so it wasn't arbitrary and

17 capricious for ORR to provide that explanation.

18             Furthermore, the point that was developed more here

19 today in argument, even though it wasn't raised in the TRO

20 motion itself, that in fact the school records are

21 authenticated, all we have is a stamp that appears on there.

22 Nevertheless, the experts, AAU, provided an explanation on why

23 there wasn't proper authentication.  That wasn't arbitrary and

24 capricious for ORR to accept that.

25             As for the fourth point, the fourth criticism about

1   improperly accepting AAU's determination that the passport and

2   national identification card were valid documents, although

3   I've carefully looked at the memo from -- the emails from AAU,

4   although they agree, they leave open the possibility that the

5   passport and national identification card might be fraudulent,

6   it was still reasonable and at a minimum not arbitrary and

7   capricious for ORR to interpret AAU's statements as suggesting

8   a high likelihood that the documents were genuine, particularly

9   given the fact that Ms. Branch brought up there was not one but

10  two different times that AAU looked at the documents.

11          Again, I realize that there is a plausible story on

12  why, even though the documents were in fact fraudulent, they

13  might have appeared to be genuine that was set forth.  You

14  know, the family sold buildings and got a lot of money to get

15  the best possible fraudulent documents in order to get out of

16  the country.  I understand that, but nevertheless, AAU, who has

17  experience in these things, looked at these documents and

18  determined, no, these are not fraudulent.  They appear valid.

19  And it wasn't arbitrary and capricious for ORR to accept that.

20          Turning to the fifth criticism, I recognize that there

21  can be critiques of the use of dental radiographs, but the

22  bottom line is the agency specifically contemplates the use of

23  radiographs as long as they exceed a certain threshold, which

24  was exceeded here, and as long as they are not used as the sole

25  basis for an age determination.  So it was not arbitrary and

capricious for ORR to use the radiographs as one piece of the
puzzle.

And finally, as for the argument that ORR relied
solely on the radiographs, that's just not supported by the
record. ORR identified four different reasons: the
radiographs, the fraudulent nature of the Tazkira, and the
valid nature of the two other documents as the basis for its
decision.

So what that leaves is, in my mind, why this is still
a debatable question that has given me some pause is I still do
tend to agree with petitioner that there are a number of fair
criticisms of ORR's analysis.

First, the fact that the age redetermination memo
wholly omits any discussion of the family statements or the
sister's identification card is not confidence inspiring.
Those were pieces of evidence that were before the agency, and
it's -- and it is disappointing that they weren't at least
addressed as part of the analysis.

I also -- I think it teeters on the edge of arbitrary
and capricious, the basis for discounting the doctor's note
simply that was written on a prescription pad when it was
signed by the doctor.

But again, although -- so on the one hand, as I've
just stated, those aspects of the ORR's analysis are not fully
confidence inspiring. But I still am not persuaded that

there's a likelihood of success on the notion that the overall

determination was arbitrary and capricious.

Again, one of the key points is that ORR made a

specific finding that one of the documents that petitioner

submitted, the Tazkira, was digitally manipulated to provide a

date that would support his story.  I know the documentation in

the record providing the basis for AAU's determination on that

point isn't particularly fulsome, but that was still these

experts' determination, having looked at the documents.

It wasn't arbitrary and capricious for ORR to accept

that determination, and that determination in turn is a really

big deal, in my view, in terms of the overall analysis.  When

you've got documents that show an adult age that appear

genuine, coupled with other documents that appear to be

manipulated and fraudulent, I just cannot find -- cannot

conclude, even despite some of the other shortcomings that I've

noted in the analysis, that it was arbitrary and capricious on

the whole for ORR to make the determination that it did.

So, and again, the point about the Tazkira, I view

that in some ways analogous to what happened in *Imon v. Keeton,*

the case that I previously had.  Although the particular act at

issue in the two cases was different -- in that case, there was

false testimony; in this case, there was a document that was

deemed to be manipulated and fraudulent -- the principle is the

same:  A fact-finder is permissibly entitled to take that type

1   of conduct into account as part of the totality of the

2   circumstances.

3          I'm not saying necessarily that if I were the

4   fact-finder in this case I would have reached the same

5   determination that ORR would have made, but again, the point

6   here is that this isn't de novo review; this is a deferential

7   standard of review looking at whether the analysis was

8   arbitrary and capricious; and I simply find, at this

9   preliminary stage of the case, on this record, petitioner

10  hasn't made that showing.

11         Now, a different -- a related and tricky issue that I

12  still -- is complicated to me to figure out what to do with is

13  the fact that the agency that currently has custody of

14  petitioner is not ORR, it's ICE.  And under its regulations, it

15  appears that ICE was required to make its own independent

16  determination of petitioner's age and document that in some

17  way.

18         Ms. Branch acknowledged today that, you know, if such

19  a -- if some document showing ICE's reasoning exists somewhere,

20  it's certainly not part of the record before me right now.  The

21  only thing before me is a -- what appears to be one sentence in

22  an email, with no reasoning from ICE, stating that ICE has also

23  determined that petitioner is an adult.

24         That is troubling to me, but when I think about the

25  overall picture in this case, I can't ignore the fact that it

may just be that ICE has not documented its reasoning but it's
already conducted its own analysis and that ORR, this other
agency, has looked at the same evidence and is required to
consider the exact same factors and has determined in a
nonarbitrary and capricious way that petitioner is an adult.

So given this stage of the case where it may be that
ICE just hasn't properly documented its reasoning -- perhaps at
a later stage of the case that might be a reason that
petitioner is granted relief, but at this preliminary stage,
where for the reasons that I've stated earlier, the law is
quite tricky on whether I even could grant a preliminary
injunction when the issue may just be that ICE hasn't properly
documented its reasoning for considering the same evidence that
ORR has already considered, I don't find that that is alone
enough to justify the extraordinary remedy of a TRO or a
preliminary injunction.

You know, just for -- going through the remaining
factors, I do find that, as for the second factor, irreparable
harm, petitioner has shown that he would be irreparably harmed
by each additional day that he spends in adult custody if, in
fact, he's being improperly held in adult custody.  So that's
certainly part of the reason why this is a request that has
given -- caused me to give it a lot of thought, and it wasn't a
slam dunk on what the outcome would be.

But given my determinations as to the first *Winter*

1   factor, I don't find that that's enough to justify the relief

2   being requested here.

3          Then finally, for the balance of the equities, again,

4   I don't find that they -- I find that they cut somewhat in

5   favor of petitioner for the same reasons of the -- largely

6   because of the irreparable harm, but I do find that they don't

7   cut overwhelmingly in his favor for the reasons that the

8   government stated in its response, the public interest.

9          There is also a valid public interest in the executive

10  branch's ability to enforce the immigration laws and comply

11  with its age determination procedures.  And so if, in fact, I

12  think it's likely that the government has complied with the law

13  here, it's hard to say that the balance of equities and public

14  interest lie in favor of ruling against the government.

15         So that's my ruling, and for those reasons, the motion

16  for a TRO and PI at Docket No. 2 is denied.

17         A different motion that is pending before me is

18  petitioner's motion at Docket No. 3 for the appointment of a

19  guardian ad litem.  My inclination is to deny that motion

20  without prejudice right now.  Given the determination I've just

21  made that petitioner is unlikely to succeed on the merits of

22  his claim that the agencies erred in finding that he's an

23  adult, it's hard for me, given that, to find that he's

24  nevertheless entitled to the appointment of a guardian ad

25  litem.

1          But, Ms. Scott, if you'd like to be heard more on that

2    issue, to the extent that you think the analysis differs in

3    some way from the TRO analysis that I just conducted, I'm happy

4    to hear from you on that.

5          MS. SCOTT:  I'll say just a quick statement, Your

6    Honor.  I understand Your Honor's holding.  We do believe that

7    petitioner is a minor, and we of course think that we have a

8    likelihood of success on the claims.

9          And given the severity of the deprivation of liberty

10   for somebody who is a minor and to be -- to be cautious, we

11   believe it's -- it would be appropriate to appoint a guardian

12   ad litem or a next of friend.  And, in fact, the Court did so

13   in I believe N.B. as well.  So we would recommend that they --

14   that they appoint one.

15         Also, Your Honor, we don't intend to tax respondents

16   for the costs and fees of the GAL.  This is just an extra

17   security for a minor, so that's all on that point.

18         THE COURT:  All right.  Here's what I'm going to do on

19   the guardian ad litem.  I'm not going to rule on that at this

20   time.  I'm going to take that under consideration.  I'm going

21   to do a little bit more research on that issue, but I have now

22   ruled on the TRO.

23         Is there anything else to address today, starting with

24   petitioner?

25         MS. SCOTT:  Not from petitioner.  Thank you, Your

1    Honor.

2              THE COURT:  All right.  From the government?

3              MS. BRANCH:  No, Your Honor.

4              THE COURT:  All right.  Have a good day.  Thank you.

5              MS. SCOTT:  Thank you.

6              (Proceedings concluded at 3:29 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 17th day of July,

13   2025.

14

15

16
                    s/Jennifer A. Pancratz_____
17                  Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25