**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

O.E.O.,

Petitioner,

v.

Fred Figueroa, et al.,

Respondents.

No. CV-25-02283-PHX-DWL (MTM)

**ORDER**

In a June 26, 2026 order, the Court indicated that Respondents' mootness arguments "seem[ed] correct" but afforded Petitioner a further chance to be heard. (Doc. 105.) Having reviewed Petitioner's resulting brief (Doc. 106), the Court changes course and agrees with Petitioner that this action is not subject to dismissal on mootness grounds.

As background, "[t]he voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed. But voluntary cessation can yield mootness if a stringent standard is met: A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. The party asserting mootness bears a heavy burden in meeting this standard." *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014). The Ninth Circuit has "not set forth a definitive test for determining whether a voluntary cessation . . . not reflected in statutory changes or even in changes in ordinances or regulations . . . has rendered a case moot" but has "indicated that mootness is more likely if (1) the policy

change is evidenced by language that is broad in scope and unequivocal in tone; (2) the policy change fully addresses all of the objectionable measures that the Government officials took against the plaintiffs in the case; (3) the case in question was the catalyst for the agency's adoption of the new policy; (4) the policy has been in place for a long time when we consider mootness; and (5) since the policy's implementation the agency's officials have not engaged in conduct similar to that challenged by the plaintiff. On the other hand, we are less inclined to find mootness where the new policy . . . could be easily abandoned or altered in the future." *Id.* at 972 (cleaned up). "Ultimately, the question remains whether the party asserting mootness has met its heavy burden of proving that the challenged conduct cannot reasonably be expected to recur." *Id.*

Here, even though Petitioner has now obtained essentially all of the relief he sought at the outset of this litigation—he has now received a favorable age redetermination, been released from an adult ICE detention facility, and been allowed to reunite with his chosen sponsor—each development was due to Respondents' voluntary cessation of the conduct that Petitioner sought to challenge. Notably, Respondents acknowledge that this lawsuit was the catalyst for those acts of voluntary cessation. (Doc. 75 at 4, emphasis added ["[T]he agencies have voluntarily agreed to reexamine their prior decisions and made make [sic] a new determination of Petitioner's age. *Due to issues raised in the litigation*, ICE asked ORR to re-take custody of Petitioner for the purpose of conducting a new age determination and ORR agreed to do so."].) This acknowledgement cuts against a finding of mootness. *See, e.g., West Virginia v. EPA*, 597 U.S. 697, 719 (2022) ("That burden is heavy where, as here, the only conceivable basis for a finding of mootness in the case is the respondent's voluntary conduct") (cleaned up); *Fikre v. Fed. Bureau of Investigation*, 904 F.3d 1033, 1039-40 (9th Cir. 2018) ("The FBI's decision to restore Fikre's flying privileges is an individualized determination untethered to any explanation or change in policy, much less an abiding change in policy. . . . DHS affirmed as late as March 2015 . . . that Fikre posed 'a threat to civil aviation or national security' and it refused to remove him from the No Fly List. Yet it did just that fourteen months later, without explanation

or any announced change in policy.  Fikre was taken off the list two months after briefing was completed on the government's motion to dismiss Fikre's lawsuit.  This record suggests that Fikre's removal from the No Fly List was more likely an exercise of discretion than a decision arising from a broad change in agency policy or procedure.").  In contrast, courts are more likely to find mootness when, unlike in this case, the acts of voluntary cessation were due to an intervening change in the law or a broader change in agency policy.  *See, e.g., Public Utilities Comm'n of State of Cal. v. F.E.R.C.*, 100 F.3d 1451, 1460 (9th Cir. 1996) (concluding that "the voluntary cessation exception is inapplicable" where "Mojave Pipeline's decision to refuse its section 7 certificate was motivated by economic/business considerations, not this litigation"); *Pizzuto v. Tewalt*, 2024 WL 2832598, *4 (D. Idaho 2024) ("Defendant Tewalt has clearly identified the Supreme Court's opinion in *Ramirez* as the catalyst for his decision to reverse course and approve Pizzuto's requests.  That independent basis for the defendants' change in stance lends credence to their assurance that Pizzuto will receive the accommodation.").

It is also notable that, in response to the Court's invitation to "provide the sort of assurances necessary to avoid application of the voluntary-cessation doctrine" (Doc. 103 at 8), Respondents did not submit any declarations or other evidence and did not affirmatively disavow an intention to revisit their treatment of Petitioner in the future.  Instead, Respondents merely asserted through counsel that it "is highly unlikely," "certainly not reasonably exepected [sic]," and "not at all probable" that they will do so.  (Doc. 104 at 1-2.)  On the one hand, the Court accepts that these representations are sincere and offered in good faith.  *Rosebrock*, 745 F.3d at 971 ("We presume that a government entity is acting in good faith when it changes its policy . . . . .").  And the plausibility of these assurances is enhanced by Petitioner's failure, in response to the Court's invitation to "identify, if one exists, any prior case in which ORR determined that an unaccompanied alien was a minor, and thus released that individual to the custody of a sponsor, only for ICE and/or ORR to later reconsider the age determination and deem the individual an adult" (Doc. 105 at 1-2), to identify any such case.  (Doc. 106.)  On the other hand,

Respondents' showing here is still less developed and convincing than the sort of showing the government often makes when attempting to establish the inapplicability of the voluntary-cessation exception to mootness. *See, e.g.*, *Picrin-Peron v. Rison*, 930 F.2d 773, 776 (9th Cir. 1991) (when the Ninth Circuit asked the government to supply "any authority for its promise" that the challenged conduct would not recur, "the government filed a declaration of the director of the Los Angeles District Office of the INS who reiterated under oath the statement made by the government in its motion"); *Pizzuto*, 2024 WL 2832598 at *4 ("Here, as in *Picrin-Peron*, the defendants have done more than make bare assertions of mootness. In both cases, the government-defendants offered sworn, unequivocal assurances that the challenged conduct would not occur in the future."). Additionally, Respondents' assurances are not entirely consistent with ORR's express disclaimer, in the most recent age determination, that "should ORR obtain new evidence, or if ORR is able to authenticate existing or new evidence, the Office reserves the right to engage in a new review." (Doc. 106 at 19.)

Given this backdrop, the Court concludes—while acknowledging that the issue presents a close call—that Respondents have not met their heavy burden of establishing mootness based on their voluntary cessation of the challenged conduct. The first *Rosebrock* factor (i.e., "the policy change is evidenced by language that is broad in scope and unequivocal in tone") cuts against Respondents because, as noted above, ORR has expressly reserved the right to reconsider the age determination and Respondents failed to provide the type of rock-solid assurances that are often provided in this context. The third *Rosebrock* factor (i.e., "the case in question was the catalyst for the agency's adoption of the new policy") also cuts against Respondents because, as noted above, this case alone— and not some intervening legal development or policy change—was the catalyst for the change in Petitioner's treatment. And the fourth *Rosebrock* factor (i.e., "the policy has been in place for a long time when we consider mootness") is also unfavorable to Respondents because all of the developments at issue occurred within the past few weeks or months. *Compare Pizzuto*, 2024 WL 2832598 at *4 ("Defendant Tewalt's commitment

- 4 -

to provide Pizzuto's requested accommodations has remained in place and undisturbed for over a year and a half."). Thus, even though the second *Rosebrock* factor (i.e., "the policy change fully addresses all of the objectionable measures that the Government officials took against the plaintiffs in the case") and the fifth *Rosebrock* factor (i.e., "since the policy's implementation the agency's officials have not engaged in conduct similar to that challenged by the plaintiff") can be viewed as favoring Respondents, on balance they are outweighed by the other factors.

As for how to proceed from here, before the issue of mootness arose, the parties proposed the adoption of a schedule under which "Cross Motions for Summary Judgment will be due to the Court thirty days after the Court's order on the Preliminary Injunction." (Doc. 98 at 2.) Because Petitioner's motion for preliminary injunction has since been denied (Doc. 103), the Court will set a deadline of 30 days from the issuance of this order to file cross-motions for summary judgment as to the remaining claims in this case.

Accordingly,

**IT IS ORDERED** that the parties' cross-motions for summary judgment are due within 30 days of the issuance of this order.

Dated this 20th day of July, 2026.

Dominic W. Lanza
United States District Judge

- 5 -